CARROLL J. STEPHENS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stephens v. Commissioner
Docket No. 932-88
United States Tax Court
T.C. Memo 1990-376; 1990 Tax Ct. Memo LEXIS 388; 60 T.C.M. (CCH) 197; T.C.M. (RIA) 90376; July 23, 1990, Filed *388 Decision will be entered under Rule 155. Philip Alan Kaiser, for the petitioner. Merle L. Stolar, for the respondent. SHIELDS, Judge. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION In a notice of deficiency dated October 26, 1987, respondent determined deficiencies in petitioner's income tax as follows: Year
Deficiency
1979
$ 4,144.43
1980
4,313.08
1981
4,476.00
1982
5,450.00
1983
7,020.00
1984
674.04
The issues for decisions are: (1) whether petitioner was engaged in the breeding, racing, and showing of horses for profit; (2) whether respondent is barred from determining a deficiency with respect to an investment tax credit taken by petitioner in 1979; and (3) if not, whether a barn used by petitioner for the shelter of horses qualifies for such credit as a single purpose agricultural or horticultural structure under section 38 and section 48(a)(1)(D). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits associated *389 therewith are incorporated herein by reference. Petitioner resided in Missouri at the time his petition was filed herein. He timely filed individual income tax returns for each of the calendar years 1979 through 1984 with the Internal Revenue Service Center at Kansas City. He also filed on April 8, 1987, amended income tax returns for 1984 and 1985 with the same Service Center. Petitioner has never been married and has no children. He was raised on a farm and as a child was responsible for the care and feeding of horses which his father owned. Throughout high school he studied vocational agriculture, which included the raising and breeding of livestock. He subsequently obtained an associate degree in accounting and served three years in the U.S. Army. He then returned to Missouri and was employed for one year as a machinist before going to work in 1963 with Ford Motor Company (Ford). By the date of trial he was a parts control supervisor for Ford. For the years 1979 through 1984 his salary at Ford was $ 24,012.10, $ 26,217.39, $ 29,528.84, $ 32,680.03, $ 40,619.29, and $ 37,619.04, respectively. Other than his salary, a small amount of dividends and interest and the horse *390 and farm income hereinafter described, petitioner had no income during the years at issue. In 1967 petitioner, one of his relatives, and a friend purchased as tenants in common approximately 30 acres of vacant land near West Alton, Missouri. They divided about three acres of the 30 acres into three tracts of about one acre each. Petitioner and each of his cotenants then built personal residences on the small tracts. However, they continued to hold as cotenants the balance of the property which they leased on a sharecrop arrangement to a local farmer for the production of soy beans, corn, and wheat. For the years 1979 through 1985 petitioner reported his share of the sharecrop income and expenses as well as the income and expenses associated with his breeding, training, showing, and racing of quarter horses on Schedules F, Farm Income and Expenses, to his Forms 1040. When he moved to his portion of the property, petitioner owned one horse which he sold in 1973. He then purchased another horse which died in 1976. These horses were not acquired or kept for profit. In or about 1978, petitioner became concerned about his prospects of continued employment with Ford. The automotive *391 industry was somewhat depressed at the time and there were rumors that the plant where he worked would soon close or begin to lay off employees. These concerns caused him to consider other means of supporting himself in the event that he was laid off or was unable to work full-time. The activity in which he had the most interest at that time was the breeding, racing, and showing of quarter horses because he liked such horses and enjoyed working with them. He had also acquired some knowledge of such a business not only through his work on his father's farm but also through the previous ownership of two horses, subscription to publications such as "The Quarter Horse Journal" and "Track Magazine," membership in the American Quarter Horse Association (AQHA), and frequent attendance at horse shows. Subsequently he acquired more knowledge of the business of breeding, racing, and showing quarter horses from memberships in such organizations as Illinois Quarter Horse Association, Illinois Racing Association, Kansas Quarter Horse Racing Association, and American Paint Horse Association. In 1978 petitioner also began to consult with contestants, judges, and trainers at horse shows and to *392 solicit their opinions regarding the financial prospects of a small horse breeding operation. He made a trip to Oklahoma and spent a week observing the operations of some breeders that he knew. While driving through Oklahoma, he frequently stopped without notice or invitation at farms along the way to talk to horse breeders about their businesses. Most of these people assured him that in their opinion the "horse economy" which was flourishing at that time would continue to thrive due to an increasing interest on the part of the public in the racing and showing of horses. They were also of the opinion that the purses and prizes being awarded successful contestants in horse races and shows would continue to increase. From the information he gathered in the above manner petitioner concluded that a small horse breeding operation could be profitably conducted on the land which he owned. In order to avoid the cost of buying and maintaining a top-quality stallion, he decided to purchase only a few broodmares with proven bloodlines and breed them to stallions with similar ancestry. Therefore, to provide shelter for the horses that he intended to breed, raise, train, race, and show, petitioner *393 constructed a barn which was completed in 1979 at a cost of $ 25,446. The barn has eight stalls which are larger than usual because, while foaling, a mare needs more spacious quarters than the typical stall provides. One of the stalls is also insulated and heated for use in case a mare foals during winter. The barn also has a paved driveway, hot and cold water, and a loft for the storage of hay. Petitioner commenced his horse activity in 1979. On January 12, 1980, he filed with respondent a Form 5213 in which he elected, pursuant to section 183(e), to postpone until the close of 1985 (the end of the seventh year of such activity) the determination of whether he was entitled to the presumption provided by section 183(d) that his horse activity was engaged in for profit because he had realized a profit in at least two of the seven years 1979 through 1985. However, the notice of deficiency covers only six of the seven years and petitioner concedes he is not entitled to the presumption since he did not realize a profit in any of the six years covered by the notice of deficiency, i.e., 1979 through 1984. On the Form 5213, petitioner described his activity as the "breeding, training, *394 showing and racing of horses * * * for a profit and not as a hobby; however, a profit is not expected until approximately [the] 5th or 6th year." Inasmuch as petitioner knew from his investigation of horse breeding that the purchase of quality broodmares and the payment of stud fees for the services of superior stallions would be substantial, he concluded that with his limited means the number of foals he could raise would be small. Consequently, he decided that a concentration on the quality of foals, as opposed to quantity, would offer the greatest chance of success. After looking at many broodmares, petitioner narrowed his choice to six or seven mares and from this group selected and purchased in 1979 for $ 7,000 Question Squaw, a 16-year-old broodmare already in foal by Sonny Dee Bar, a nationally known stallion, which by the end of the 1985 season was ranked number one in AQHA's Leading Sires of Performance Winners and had sired 42 foals that had won AQHA approved contests. Even though he was aware that a 16-year-old mare has a limited number of years in which to breed, petitioner considered Question Squaw a good buy. He felt that she would produce at least a few quality foals *395 because he had examined and had been impressed by a filly which Question Squaw had previously foaled and her AQHA record revealed no previous difficulty in producing healthy foals. Petitioner was also impressed by the fact that Question Squaw was already in foal by Sonny Dee Bar for which her previous owner had paid the stallion's standard stud fee of $ 3,500. In 1980 Question Squaw gave birth without difficulty to a filly (a female foal) which petitioner named Sonnys Teardrops. Shortly thereafter petitioner contracted with a breeder in Ada, Oklahoma, to breed Question Squaw at a cost of $ 1,900 to Jet Smooth, an AQHA champion and a triple A race horse. To accomplish this breeding petitioner hauled the mare to the stallion's ranch, which was a full day's drive from petitioner's home, and stayed over a weekend while the horses bred. From this pairing Question Squaw foaled in 1981 Smooth Savage, a colt (a male foal), which petitioner sold in 1984 for $ 3,500. In 1981 Question Squaw, after foaling Smooth Savage, was bred by petitioner at a cost of $ 1,020 to Color Me Skip, which by the end of the 1985 season was an AQHA champion and ranked by AQHA as number 12 in the Leading Sires of *396 Halter Class Winners. By this time Color Me Skip had sired a total of 389 foals including 145 AQHA class winners and eight foals which had been classed grand champions on a total of 18 occasions. The offspring of the union of Question Squaw with Color Me Skip was Whispering Squaw, a filly which was born in 1982 and sold by petitioner in 1984 for $ 4,500. In 1982 petitioner bred Question Squaw at a cost of $ 5,000 to Sir Quincy Dan, a stallion which by the end of 1985 was ranked number 10 by the AQHA in both its Leading Sires of Halter Class Winners and its Leading Sires of Point-Earning Halter Horses. The offspring from this union was Quintana Quincy, a colt born in 1983, which was still owned by petitioner at the end of 1985 and at the time of trial. After Quintana Quincy's birth in 1983 petitioner bred Question Squaw back to Sir Quincy Dan but she did not settle pregnant. Consequently, there was no breeding fee in 1983 and no foal for Question Squaw in 1984. After being advised by his veterinarian that the mare's problems were not serious and all that she needed was a rest, petitioner subsequently bred Question Squaw at a cost of $ 750 to Tardy Too. This breeding produced Tardy *397 Squaw Dancer, a filly, in 1985. Petitioner had Tardy Squaw Dancer trained as a racer and in 1987 entered her in the Solid Gold Futurity at Springfield, Illinois. When she came in third he sold her for $ 3,400. In 1985 Question Squaw was bred to Darn Good Hobby. Again she failed to settle pregnant and petitioner concluded she was at or near the end of her fertile years. He leased her as a broodmare in 1986, and sold her in 1987 for $ 3,400. In 1983 Sonnys Teardrops, the first foal produced by Question Squaw for petitioner, was bred at a cost of $ 500 to Mr. Te Dell. The offspring of this union, Sheena Te Dell, was born in 1984 and at the time of trial was being used by petitioner as a broodmare. In 1984, Sonnys Teardrops was bred at a cost of $ 1,500 to Tardy Too and in 1985 foaled Tarnished Tardy, a colt which was sold in 1986 for $ 1,700. In 1985 Sonnys Teardrops was bred at a cost of $ 1,500 to Mr. Biltrite and in 1986 foaled a colt named Sonny Suggestive which petitioner was advertising for sale at the date of trial. The low stud fees of only $ 500 for the services of Mr. Te Dell in 1983 were obtained by petitioner at an auction. The $ 500 fee was about half of Mr. Te Dell's *398 usual stud fee. Petitioner bred Whispering Squaw to Smooth Savage in 1983 even though he was aware that any offspring of this union could not be registered with the AQHA since both its parents would have the same mother. Petitioner had problems with the breeding of Whispering Squaw and she had difficulty settling pregnant and with carrying the foal to term. She also had difficulty with the delivery of the foal. Because of these problems, petitioner sold Whispering Squaw in 1984 for $ 4,500. The filly which she produced from the union with Smooth Savage was never named or registered but was sold by petitioner in 1985 for $ 2,300. From the foregoing activity petitioner acquired nine horses during 1979 through 1985 by purchase or by breeding as listed below: Name of
Year
Horse
Acquired
Manner
Question Squaw
1979
Purchase
Sonnys Teardrops
1980
Breeding
Smooth Savage
1981
Breeding
Whispering Squaw
1982
Breeding
Quintana Quincy
1983
Breeding
Sheena Te Dell
1984
Breeding
Unregistered Mare
1984
Breeding
Tardy Squaw Dancer
1985
Breeding
Tarnished Tardy
1985
Breeding
During the same period, 1979 through 1985, petitioner sold three horses as follows: Name of
Year of
Sales
Horse
Sale
Price
Whispering Squaw
1984
$ 4,500
Smooth Savage
1984
3,500
Unregistered Mare
1985
2,300
At *399 the end of 1985 he still owned the six horses listed below: Name
Description
Question Squaw
Broodmare
Sonnys Teardrops
Broodmare
Quintana Quincy
Stallion
Sheena Te Dell
Yearling Mare
Tardy Squaw Dancer
Mare Colt
Tarnished Tardy
Male Colt
As indicated hereinbefore, after the end of 1985 but before the trial in 1988, petitioner sold both Tardy Squaw Dancer and Question Squaw in 1987 for $ 3,400 each. Consequently, from the beginning of 1979 to the date of trial petitioner had sold five horses, i.e., Whispering Squaw, Smooth Savage, the unregistered mare, Tardy Squaw Dancer, and Question Squaw, for $ 17,100 or at an average price of about $ 3,400. At the time of trial he still owned Sonnys Teardrops, Quintana Quincy, Tarnished Tardy, and Sonny Suggestive, the colt foaled by Sonnys Teardrops in 1986. Whenever petitioner entered into a breeding contract for one of his mares, he insisted that the agreement be in writing and that it contain certain guarantees. For instance, under the breeding agreements he was guaranteed a foal capable of standing and nursing on its own. Furthermore, if an unsuccessful pairing resulted from the impotency of a stallion, the agreements provided that the stud fee was *400 to be refunded to petitioner; and even if the fault lay with the mare, petitioner was entitled to a second service by the same stallion. Initially petitioner attempted to limit to $ 2,000 the amount he would pay for a stud fee, but he subsequently learned that he could breed his mares to quality stallions at relatively low stud fees by doing extensive research regarding available stallions and by being willing to expend his own time, effort, and money to transport his mares considerable distances in order to have them bred. In addition to the expense of breeding his mares, petitioner also incurred substantial expenses in training and entering them and their offspring in races and shows. The entry of his horses in such events was considered necessary by petitioner because a victory or other impressive showing by one of them would not only increase the value of the entrant but would also increase the value of its dam and any siblings of the entrant. To a quarter horse breeder, the type of event which has the most value, and hence is the most expensive, is a futurity. Typically a futurity requires an owner to register his or her horse as a yearling in a future race and to agree to pay *401 an entry fee in installments over the period between the registration and the date of the race. For example, Smooth Savage, the colt born to Question Squaw in 1981, was entered as a yearling in 1982 by petitioner in the All-American Futurity which was to be run on Labor Day in 1983 at Ruidoso Downs, New Mexico. The total entry fee, which was payable in eight increasing installments, was substantial because the total purse for the futurity was $ 2,500,000. The winner was to receive $ 1,000,000 but all other qualifying entries were to receive some part of the balance of $ 1,500,000. To qualify for the All-American an owner had not only to pay all installments of the entry fee but his horse had to also win sufficient qualifying points in preliminary races. At any point during a campaign for entry in the All-American the owner of a registered horse could elect to withdraw the horse from the futurity. Upon such withdrawal the owner was not liable for any unpaid installments on the entry fee but he forfeited any installments previously paid. After registering Smooth Savage for the All-American petitioner placed him with a well-known trainer in Oklahoma. In the early stages of his training *402 and in his first race in the campaign for the All-American, Smooth Savage performed so well that petitioner, on the advice of his trainer, entered Smooth Savage in the Kansas Futurity which was to be run on July 4, 1983, and had a total purse of $ 700,000. However, at or about this point petitioner's trainer moved from the area, a new trainer had to be employed, Smooth Savage began to fail as a racer, and as a result petitioner withdrew Smooth Savage from both futurities after making payments totaling $ 2,800 on his entry fees. Ultimately on the advice of the new trainer, petitioner had Smooth Savage retrained as a show horse and in 1984 sold him as a western pleasure horse for $ 3,500. The total cost of training the horse first as a racer then as a show horse was more than $ 4,000. To sell a horse, petitioner placed advertisements in horse-related publications, such as "Horses Unlimited," "Heart of America Horseman," "The Yearling Magazine," and "The Quarter Horse Journal." He also was able to locate potential buyers through word-of-mouth referrals by the trainers whose services he utilized from time-to-time. Even though he was a full-time employee with Ford throughout the years *403 at issue, petitioner nevertheless devoted substantial time and effort to his horse breeding activities. He spent about an hour before work each morning with them and an additional three to five hours after he returned home in the afternoons. During this period he gave up all other hobbies and spent his weekends and vacations transporting the horses to and from stud farms and trainers and tending to their other needs. To avoid the expense of a veterinarian he attended his mares during their deliveries and handled all births himself. When a mare was ready to foal, he slept in the barn in case the horse needed his assistance during delivery. Only broodmares and colts up to yearlings were kept at his barn. All other horses were in training and were with their trainers. Since broodmares, colts, and yearlings cannot be ridden petitioner never rode any of the horses at his barn nor did he allow anyone else to ride them. Petitioner did not maintain a separate bank account or separate accounting records for his horse activities. He did, however, maintain accurate records and original supporting data for the expenses related to such activities as well as a detailed history with respect *404 to each horse. From these records petitioner prepared his own income tax returns for the years in question and respondent does not question any item of income or expense reported therein. Respondent allowed all expenses claimed by petitioner to the extent permitted under section 183(b)(1). On his Schedules F for 1979 through 1985 petitioner claimed a total of $ 88,229.92 in deductions and reported a total of $ 17,656.97 in income from his sharecropping and horse activities. He did not report a profit in any one of the seven years. At the outset of the horse activities petitioner expected to begin to operate at a profit by 1983. When faced with losses beyond that year, petitioner attempted to cut operating costs by personally performing tasks which he had formerly hired others to do such as trimming their hooves. He also began to search for stallions with lower stud fees to breed to his mares and to use a cheaper mix of feed for his horses. In his opinion the losses which he continued to incur were the result at least in part of the "Adopt a Horse" program sponsored by the government which flooded the market with inexpensive horses during 1980 through 1983 and depressed the sales *405 price of the horses which he was able to raise. On January 14, 1982, respondent mailed to petitioner a notice of deficiency in which he disallowed the investment credit claimed by petitioner for 1979 with respect to his barn. In the notice respondent determined that the barn did not qualify for the investment credit. A timely petition was filed by petitioner in this Court contesting respondent's determination. When the case was called for trial respondent explained that the notice was inadvertently issued because the eligibility of the barn for the investment credit depended in part upon whether petitioner was engaged in his horse breeding activity for profit and petitioner had elected to postpone this determination until the end of 1985. Pursuant to respondent's oral motion an agreed Order and Decision was entered that no deficiency existed with respect to 1979. In his notice of deficiency of October 26, 1987, respondent determined again that petitioner was not entitled to the investment credit in 1979 with respect to the barn because petitioner was not engaged in the breeding, racing, and showing of horses for profit, or if he was, the barn does not qualify for such credit under *406 sections 38 and 48. OPINION Horse Breeding and Related Activities. The primary issue in this case is whether petitioner engaged in his horse breeding activities for profit. Petitioner contends that he was and that the expenses he incurred therein are fully deductible as business expenses. Conversely, respondent contends that petitioner engaged in such activities only as a hobby and that the deductibility of the expenses is limited to those allowed by section 183(b)(1) and (2). Respondent also contends that, because the activity was not engaged in for profit, petitioner is not entitled to the investment tax credit claimed with respect to the barn; or in the alternative, if we find that petitioner's activity was engaged in for profit, the investment credit is still unavailable to petitioner because the barn was used for the shelter of horses, and therefore, does not qualify as section 38 property. It is well established that in determining whether an activity is engaged in for profit a reasonable expectation of profit is not required, so long as the relevant facts establish that the activity was engaged in with a bona fide profit objective. Sec. 1.183-2(a), Income Tax Regs.; Fox v. Commissioner, 80 T.C. 972, 1006 (1983), *407 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). See also Brannen v. Commissioner, 78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Hirsch v. Commissioner, 315 F.2d 731 (9th Cir. 1963), affg. a Memorandum Opinion of this Court. In making the determination, all relevant facts and circumstances must be considered but greater weight is to be given to objective facts rather than the taxpayer's after-the-fact statements of intent. Sec. 1.183-2(a), Income Tax Regs.Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Flowers v. Commissioner, 80 T.C. 914, 931-932 (1983). Under section 183(d), a taxpayer engaged in horse-breeding is presumed to be engaged in such activity for profit if the gross income from the activity exceeds his deductions in two or more tax years in a period of seven consecutive years. Since petitioner admits that his horse breeding activity *408 did not earn a profit in any of the six years in question, he is not entitled to the presumption provided by section 183(d). Hence petitioner has the burden of proof on this issue without the benefit of the presumption provided by section 183(d). Rule 142(a); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The relevant factors heretofore taken into account by this and other courts in determining whether an activity is engaged in for profit are set out in section 1.183-2(b), Income Tax Regs. They are as follows: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that an asset used in the activity may appreciate in value; (5) the success of the taxpayer in previously carrying on the same or similar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation enjoyed by the taxpayer from *409 his involvement in the activity. The above factors are not exclusive and are applied according to the unique facts of each case. Sec. 1.183-2(b), Income Tax Regs. No one factor or group of factors is determinative. Golanty v. Commissioner, supra at 426-427. We discuss below each of the factors and their application to this case. (1) We are satisfied, and so find, that petitioner conducted his horse breeding activity in a businesslike manner. While he failed to maintain a separate bank account and separate accounting records for his breeding, raising, training, racing, and showing of horses, he did keep sufficient records of his income and expenses to permit the preparation of his own tax returns in such a manner that respondent has accepted his report of the income and expenditures but questions only the profit objective with respect to his activities. Furthermore, the records in evidence clearly demonstrate that he had a record of every relevant event which occurred with respect to his horses, such as their cost, purchase and sale dates, breeding fees, training expenses, and selling prices, as well as their racing and showing performances. Such meticulous attention to detail is *410 consistent with a profit objective. The written contracts which petitioner entered with the owners of stallions have the formality one would expect of a businessman acquiring a service with a profit in mind. While respondent contends that petitioner was engaged in the activity only because of his fondness for horses, we find from the record as a whole that petitioner bought and sold horses as an astute businessman would buy or sell any business asset. When a horse did not live up to his expectations of ability to breed or race, petitioner was quick to put the horse on the market, as any competent businessman would dispose of an unprofitable asset. Rather than taking a lackadaisical attitude towards the sale of an undesirable horse, petitioner placed advertisements in appropriate publications and sold the horse as soon as possible at the highest offer. Petitioner's businesslike manner with respect to his horses is also illustrated by the thorough research which he carried out before purchasing Question Squaw, his first broodmare, and engaging the services of all of the potential sires for his mares. His success in researching potential sires is illustrated by the fact that in 1981 *411 he was able to breed Question Squaw to Color Me Skip at a relatively low stud fee of only $ 1,020. However, by the end of 1985, Color Me Skip was an AQHA champion with an impressive AQHA record, as well as the sire of 389 foals, including 145 class winners and eight foals that had been classed grand champions on a total of 18 occasions. Further evidence of petitioner's businesslike manner was his willingness to make changes needed in his operation. When confronted with consistent losses, he tried to reduce costs by using cheaper feed mixes and by performing tasks that he formerly hired others to do. When Smooth Savage failed to successfully perform after extensive training as a race horse, petitioner did not hesitate to retrain him as a show horse and when this also failed he sold him. Changes in unprofitable operations and the abandonment of unprofitable methods are indications of a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs.; Engdahl v. Commissioner, 72 T.C. 659, 669 (1979). In support of his contention that petitioner did not conduct his horse breeding activities in a businesslike manner, respondent makes much of the fact that petitioner paid $ 7,000 for Question *412 Squaw, a 16-year-old broodmare with a limited number of breeding years, and the fact that petitioner bred Whispering Squaw to her half brother, Smooth Savage, even though any offspring from this incestuous relationship (respondent's terminology) could not be registered with AQHA. With respect to his claim regarding the probable limited fertility of Question Squaw at the date of her purchase by petitioner, respondent overlooks the fact that during the period 1980 through 1985 Question Squaw produced five foals, some of which were sold by petitioner for substantial amounts. At the average price of $ 3,400 which petitioner received for all of the horses he sold during this period, including the unnamed and unregistered offspring produced by Whispering Squaw's union with Smooth Savage, the five foals obtained from Question Squaw were worth at least $ 17,000. When consideration is given to Question Squaw's history during the eight years following her purchase by petitioner, we are unable to conclude that petitioner paid $ 7,000 in 1979 to acquire what respondent in effect contends was a poor old barren mare. The fallacy in this contention by respondent is apparent because at her purchase *413 Question Squaw was in foal by Sonny Dee Bar, a nationally known stallion, at a stud fee of $ 3,500; during the following six years she produced five foals worth at least $ 17,000; and in 1987 was finally sold by petitioner for $ 3,400. We are satisfied, and so find, that with this history Question Squaw's acquisition did not constitute evidence of unbusinesslike conduct by petitioner. With respect to the foal produced by the union of Whispering Squaw with Smooth Savage, which respondent in effect considers a poor little unnamed and unregistered equine waif, petitioner testified in a forthright and credible manner that it is common knowledge in the breeding business that a mare's first breeding is usually her most difficult and that her first foal is usually her least valuable. He also testified in the same manner that, as the time of Whispering Squaw's first breeding approached he became aware from her conduct that the breeding would be difficult. Consequently, when these factors are taken into consideration, it is difficult to see how petitioner's decision to breed Whispering Squaw to Smooth Savage is an example of unbusinesslike conduct. In our view, by so choosing, petitioner *414 managed to accomplish a difficult breeding having a doubtful outcome without incurring a service fee to the owner of an unrelated stallion and the costs in time, effort, and money of transporting the mare to the stallion. (2) We have found that petitioner had acquired some knowledge of a horse breeding business from his work on his father's farm. He had also taken courses in high school which dealt with the breeding of livestock including horses. Prior to undertaking his breeding activity he also made his own investigation of the business by contacting breeders at various horse farms in order to ascertain whether a small operation such as he envisioned could be profitable. Furthermore, petitioner consulted with the trainers and breeders which he met at the many shows he attended. He then began his operation in accordance with the advice he had received. Throughout the period under consideration he continued to use and consult with trainers and veterinarians which he employed. The preparation by a taxpayer for an entry into a new activity by the study of its accepted business, economic, and scientific practices, and his consultation with experts and other parties engaged in such *415 activities are indications that the taxpayer engaged in the activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs. We are convinced that petitioner's lack of personal expertise at the beginning of his activity was more than offset by the knowledge which he acquired from his many consultations with parties already engaged in horse breeding and related activities and by the knowledge which he acquired in the course of conducting his operation. (3) From our findings it is apparent that the amount of time and effort which petitioner devoted to the activity in question was substantial. He spent a minimum of six hours a day during the week and almost all of his weekends and vacations tending to the horses at his barn and transporting them for breeding and training. When a mare was foaling he slept in the barn in order to be available to assist in the delivery of the foal. Such devotion by a taxpayer of personal time and effort to carrying on an activity is an indication of an objective to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs.
(4) The term "profit" as used in the regulations means not only a profit from current operations but also any appreciation in value of the assets *416 used or produced in the activity. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioner testified that he felt that his barn had appreciated in value, however, the record contains no evidence in support of that assertion. Therefore we cannot speculate on its possible appreciation. However, at the end of 1985 he owned six horses, five mares and one stallion. Using the average price of $ 3,400 which he received from the sale of horses during the period under consideration it appears that these six had a total value of at least $ 20,400. In addition, it should be noted that the deductions totaling $ 70,527.40 claimed by petitioner for the years 1979 through 1985 included depreciation on the barn in the total amount of approximately $ 12,000. When consideration is given to the income of $ 17,656.97 reported by petitioner from his horse and related activities during 1979 through 1985, the six horses on hand at the end of 1985 at a total value of $ 20,400, the barn which he still had at its original cost of $ 25,446, and the deductions for depreciation, it is not difficult to conclude as petitioner did that economically speaking he had lost little if any money by engaging in his horse breeding *417 activities. For our purposes, however, his tax savings are not relevant; but even without these, his total economic loss would not be substantial. (5) Since petitioner had no previous experience in the same or a similar business this factor weighs in favor of respondent. Sec. 1.183-2(b)(5), Income Tax Regs.
(6) and (7) The continued operation of an activity which remains unprofitable past a reasonable start-up phase is an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, a history of losses is not necessarily determinative of a lack of a bona fide profit objective. See, e.g., Engdahl v. Commissioner, 72 T.C. at 666 (deductions allowed in spite of 12 years of losses in a horse breeding operation); Allen v. Commissioner, 72 T.C. 28, 34-35 (1979) (deductions allowed in spite of 12 years of losses in a ski lodge operation). A series of losses beyond the start-up stage may not be inconsistent with a bona fide profit objective if such losses can be explained as the result of unforeseen circumstances, such as depressed market conditions, beyond the taxpayer's control. Sec. 1.183-2(b)(6), Income Tax Regs. The record contains some *418 evidence that the market for quarter horses became depressed at or near the time petitioner expected to begin to turn a profit. However, from the record as a whole we are unable to find that petitioner would have realized a profit in the usual sense even if there had been no such depression unless Smooth Savage or some other horse owned by him had won or done exceptionally well in a futurity or some other event. Nevertheless, an opportunity to earn a substantial ultimate profit in a speculative venture is sufficient to indicate that the activity was engaged in for profit even though only losses were generated. Sec. 1.183-2(b)(7), Income Tax Regs. Admittedly petitioner's activities in this case were very speculative. However, there was the potential that one or more of his horses would develop into an extremely valuable animal. For instance, if Smooth Savage had continued to develop as promisingly as he did in his early training, petitioner could have realized a substantial profit not only from Smooth Savage's winnings, but also from petitioner's investments in Smooth Savage's dam, his offspring, his siblings, and their offspring. Consequently, while we find that the lack of profit *419 in this case weighs against petitioner, its weight is lessened somewhat by this possibility even though highly speculative. (8) Petitioner's salary from Ford was sufficient to provide him with an adequate living but it was not large enough in the absence of other sources of substantial income to permit him to comfortably sustain the losses which he incurred. Accordingly, this factor weighs strongly in favor of petitioner. Sec. 1.183-2(b)(8). (9) In cases involving the breeding of horses, it is often found that the purpose for entering the activity was for pleasure or recreational benefits rather than a bona fide profit objective. See, e.g., Golanty v. Commissioner, 72 T.C. 411 (1979); Dunn v. Commissioner, 70 T.C. 715, 721 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980). However, we are satisfied that this case is factually distinguishable from the cases involving "gentleman farmers" or an alleged horse breeder operating a stable for the pleasure and recreation of his family and friends. Petitioner was not married and had no children. Furthermore the record contains no evidence that he invited relatives, friends *420 or acquaintances to his barn to see or ride his horses. In fact, even petitioner was unable to ride the horses kept at the barn because they were either too young or were broodmares in foal. Petitioner concedes that he enjoys working with horses, but this fact alone does not preclude a finding that the activity was engaged in for profit. Sec. 1.183-2(b)(9), Income Tax Regs.; Jackson v. Commissioner, 59 T.C. 312, 317 (1972). Whatever enjoyment he derived from his proximity to the horses had to be considerably diminished by the mucking-out of their stalls and the long hard drives he had to make to transport them for breeding and training. On those occasions when he had to sleep in the barn in order to be near a foaling mare, he must have concluded that the enjoyment was completely eliminated. All such activities amounted to hard dirty work for someone who was already employed at a full-time job. Consequently, this factor weighs in favor of petitioner. See Engdahl v. Commissioner, supra at 670-671. While some of the factors discussed above tend to support respondent's position and some may be viewed as neutral, we are convinced that as a whole the facts involved in this case are clearly *421 in favor of petitioner. We realize that an objective, reasonable person might have concluded that a small operation like his had little if any chance of being a profitable venture. However, such a standard is not applicable here; and from petitioner's forthright and credible testimony we conclude that petitioner engaged in his horse-breeding activities during the years at issue with a bona fide objective of making a profit. Accordingly, the losses he incurred in such activities during the years 1979 through 1984 are deductible. Investment Credit. On his 1979 income tax return, petitioner claimed an investment credit in the amount of $ 2,544.60 with respect to the barn which he constructed and during the years 1979 through 1984 used exclusively for the shelter of his horses. Section 38 provides that a credit is allowed to a taxpayer for a qualified investment in certain property. The investment credit is limited to "section 38 property." Sec. 1.48-1(a), Income Tax Regs.Section 38 property includes "single purpose agricultural or horticultural structures." Sec. 48(a)(1)(D). However, a single purpose agricultural structure within the meaning of section 48(a)(1)(D) and section 38 *422 does not include a barn or other structure designed and used exclusively for housing, raising, or feeding horses. Sec. 1.48-10(b)(2)(i) and (3)(i), Income Tax Regs.; McKenzie v. Commissioner, 85 T.C. 875 (1985). To qualify for the investment credit a structure must also be property with respect to which depreciation is allowable under section 167. Sec. 48(a)(1). Depreciation is allowable only with respect to property used in a trade or business or is held for the production of income. Sec. 167(a); Flowers v. Commissioner, 80 T.C. at 931. From the foregoing it follows that no investment credit is allowable for property used by a taxpayer in an activity not engaged in for profit, or a structure designed and used exclusively for housing, raising, or feeding horses. Respondent first contends that petitioner is not entitled to the investment credit with respect to the barn because the barn was used in an activity which was not engaged in for profit. Our conclusion reached hereinbefore that petitioner's horse breeding operation was an activity engaged in for profit is dispositive of this contention. In the alternative, respondent contends that the credit is nonetheless unavailable to *423 petitioner because the barn is not a "single purpose agricultural or horticultural structure" within the meaning of section 48(a)(1)(D). Petitioner does not contest the substantive position taken by respondent in the second contention. Instead petitioner argues that respondent is precluded from contending that the barn is not a structure qualifying for the investment credit in 1979 by the Order and Decision entered in the previous matter on March 11, 1983, which states that no deficiency existed in petitioner's 1979 taxable year. In addition, as we understand it, petitioner also contends that while the statute of limitations is open as to whether the credit may be disallowed on a finding that the activity was not engaged in for profit, it is closed with respect to any determination as to whether the barn is a "single purpose agricultural or horticultural structure" within the meaning of section 48(a)(1)(D). We find no merit in either of petitioner's contentions because the election which petitioner made by filing Form 5213 operated by its terms to extend the period of limitations with respect to any item of deduction or credit which might have been disallowed by a determination *424 that the activity was not engaged in for profit. Sec. 183(e)(4). Furthermore, respondent is not precluded from contending that the barn is not a structure qualifying for investment credit by entry of the Order and Decision in the previous case because in the previous case the parties agreed to leave that issue open. We conclude, therefore, that petitioner is not entitled to the investment credit because his barn does not qualify as section 38 property since it was designed and used by petitioner exclusively for housing, raising, and feeding horses. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩